**PHARMACEUTICAL MANUFACTUR-
ERS ASSOCIATION, Plaintiff,**

v.

**Robert H. FINCH, Secretary of Health,
Education and Welfare, and Herbert L.
Ley, Jr., Commissioner of Food and
Drugs, Defendants.**

Civ. A. No. 3797.

United States District Court
D. Delaware,
at Wilmington.

Jan. 16, 1970.

Alexander L. Nichols and David A. Drexler of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Lloyd N. Cutler, Daniel Marcus and Frank W. Lloyd of Wilmer, Cutler & Pickering, and Bruce J. Brennan, Washington, D. C., of counsel, for plaintiff.

F. L. Peter Stone, U. S. Atty., Wilmington, Del., William W. Goodrich, Asst. Gen. Counsel, Eugene M. Pfeifer, Atty., U. S. Dept. of Health, Education and Welfare, Washington, D. C., of counsel, for defendants.

OPINION

LATCHUM, District Judge.

■ In this action for declaratory and injunctive relief, the Pharmaceutical Manufacturers Association ("PMA"), on behalf of its members,[1] seeks a preliminary injunction restraining the Secretary of Health, Education and Welfare ("the Secretary") and the Commissioner of Food and Drugs ("the Commissioner") from taking any action in reliance upon the regulations contained in the Commissioner's Order of September 19, 1969 ("the September regulations"), 34 Fed.Reg. 14596. The September regulations promulgated new standards of evidence necessary to demonstrate the effectiveness of drug products and applied those standards retroactively so as to place in jeopardy the continued marketing of thousands of drug products introduced before 1962 with Food and Drug Administration ("FDA") approval and the effectiveness of which FDA has not yet challenged. Specifically, the regulations detail criteria for "adequate and well-controlled clinical investigations" that will be deemed by the Commissioner to constitute "substantial evidence" of effectiveness and excludes as irrelevant other clinical tests and documented clinical experience. The regulations further provide that when the Commissioner seeks to remove a product from the market for lack of substantial evidence

---

1. PMA is a non-profit Delaware corporation whose membership includes approximately 130 companies that manufacture and distribute in interstate commerce drug products subject to the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq. ("the Act"). PMA's member companies account for the manufacture and sale of more than 90% of the nation's prescription drug products. PMA has standing to sue. National Motor Freight Traffic Ass'n, Inc. v. United States, 205 F.Supp. 592, 593 (D.C.1962), aff'd 372 U.S. 246, 83 S.Ct. 688, 9 L.Ed.2d 709 (1963).

of effectiveness, the affected drug company will be entitled to a hearing only if it demonstrates to the Commissioner an ability to produce substantial evidence before a hearing is held, and convinces the Commissioner that the efficacy of the drug in question is, in fact, supported by adequate and well controlled clinical investigation of the kind described in the regulations.

To properly understand the present case some background concerning the marketing scheme of drugs under the Act must be noted. Under Section 505 of the Act, 21 U.S.C. § 355, a "new drug" can be marketed only if a new drug application, approved by the FDA, is in effect with respect to such drug. A "new drug", as defined in Section 201(p) of the Act, 21 U.S.C. § 321(p), is basically one that is not generally recognized as safe and effective for use under the conditions recommended in its labeling. The vast majority of prescription drugs manufactured by plaintiff's member companies (aside from antibiotics) were "new drugs" when first developed and marketed, and therefore, are or have been subject to approved new drug applications under Section 505. Antibiotic drugs are marketed under a separate statutory scheme providing for batch certification by FDA according to standards set forth in regulations prescribing characteristics of strength, quality, and purity deemed necessary to insure safety and efficacy of use. Section 507, 21 U.S.C. § 357(a).

From 1938, when the Act was first enacted, until 1962, there was no requirement that the effectiveness of a "new drug" be demonstrated before a new drug application was approved; only the safety of the drug had to be established. Likewise, before 1962, Section 505(e) of the Act provided for the suspension of an approved new drug application, after notice and opportunity for hearing, on the ground the drug had been shown unsafe, but not because of lack of effectiveness. 52 Stat. 1052, 1053 (1938).

In 1962, Congress amended Section 505 to require that new drugs be shown to be effective as well as safe before applications for marketing of such drugs are approved. Claims of "effectiveness" for a drug were required to be supported by "substantial evidence." Thus, as a result of the 1962 amendment, approval of a new drug application may be refused, if after notice and opportunity for a hearing, the FDA finds there is a "lack of substantial evidence" that the drug is effective for its recommended use. § 505(d), 21 U.S.C. § 355(d). Similarly, Section 505(e), as amended, 21 U.S.C. § 355(e), authorizes the Secretary to withdraw approval of a new drug application (including those approved before adoption of the 1962 amendments) if, after notice and opportunity for hearing, he finds "on the basis of new information before him with respect to such drug, evaluated together with information available to him when the application was approved, that there is lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling thereof."

Section 505(d) of the Act, 21 U.S.C. § 355(d) defines substantial evidence to mean—

"evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof."

A separate but similar procedure has been provided for antibiotic drugs. Section 507 of the Act, 21 U.S.C. § 357, providing for the certification of antibiotic drugs, has contained a requirement of efficacy as well as safety since its original enactment in 1945. Before 1962, however, Section 507 applied only to cer-

tain named antibiotic drugs.[2] Drug products containing these antibiotics have, therefore, been subject to regulations designed to insure efficacy as well as safety since becoming subject to batch certification under Section 507. Before 1962, drug products containing other antibiotics were subject to the "new drug" provisions of Section 505 which did not at that time include any requirement of effectiveness. In 1962 Congress amended Section 507 to cover all antibiotic drugs. Antibiotics that had previously been marketed under new drug applications were "transferred" to Section 507, with a provision that the initial regulations providing for the certification of batches of such drugs would not be conditioned upon an affirmative finding of efficacy. Congress provided, nevertheless, that regulations for the certification of those drugs might subsequently be amended or repealed on a finding by the Secretary—

> "[O]n the basis of new information with respect to such drug evaluated together with the information before him when the application under section 505 became effective or was approved, that there is a lack of substantial evidence (as defined in section 505(d)) that the drug has the effect it purports or is represented to have under such conditions of use." Section 507(h), 21 U.S.C. § 357(h).

The procedures for amendment or repeal of antibiotic regulations are set forth in Section 507(f). They provide for notice of proposed action, an opportunity to present views, and a hearing on objections stating "reasonable grounds" in opposition to any final order amending or repealing a regulation.

Pursuant to the 1962 amendments, the FDA determined to undertake a review of the effectiveness of drugs that had been approved for marketing between 1938 and 1962. Thus, in 1966 the Agency entered into a contract with the National Academy of Sciences-National Research Council ("NAS-NRC") for the conduct of this effectiveness review, and invited manufacturers of products marketed between 1938 and 1962 to submit to the NAS-NRC data to support claims of effectiveness for these drugs. Panels of physicians selected by the NAS-NRC have, over the past two years, reviewed the claims for effectiveness of some 2800 drug products, and prepared reports for the FDA containing conclusions as to the effectiveness of these drugs. The FDA is currently in the process of reviewing this mass of reports, and has begun publishing in the Federal Register, from time to time, summaries of the conclusions of the NAS-NRC with respect to particular drugs. In several instances, on the basis of conclusions of NAS-NRC panels, the FDA has initiated action to remove products from the market on the ground of lack of substantial evidence of effectiveness.

In two instances involving antibiotic combination drugs, the FDA (before issuing the September regulations) sought, on the basis of NAS-NRC reports, to repeal regulations providing for the certification of these products—and thus to require their removal from the market—before providing a hearing or before acting on objections filed by affected parties requesting a hearing. In both cases, the district court involved issued a preliminary injunction prohibiting the FDA from making effective any order removing the product from the market until thirty days after acting on objections filed by the parties—i. e., ruling as to whether "reasonable grounds" for a hearing had been stated by the affected party in its objection. Upjohn Co. v. Finch, 303 F.Supp. 241 (S.D.Mich., 1969); American Home Products Corp. v. Finch, 303 F.Supp. 448 (D.Del., 1969). While not deciding the issues, both Courts questioned (1) the correctness of

---

**2.** Antibiotics subject to Section 507 before the enactment of the 1962 amendments were penicillin, streptomycin, chlortetracycline, chloramphenicol, bacitracin, and derivatives of those drugs. 59 Stat. 463 (1945); 61 Stat. 11 (1947); 63 Stat. 409 (1949); 67 Stat. 389 (1953).

the FDA's refusal to consider as relevant on the issue of effectiveness documented clinical experience and clinical tests other than those that meet the criteria of "adequate and well-controlled" and (2) FDA's theory that "reasonable grounds" for a hearing exist only when the Commissioner determines that the evidence presented to him does, in fact, constitute "substantial evidence" of effectiveness. Apparently, the questioned theories of the FDA in those two cases gave rise to the September regulations at issue in this case. These regulations, for the first time, set forth FDA's interpretation of the nature of the evidence required to provide substantial evidence of effectiveness under the Act. As previously noted, they provide that only clinical investigation meeting the criteria set forth in the regulations will be deemed to be "adequate and well-controlled investigations" which can be considered as providing "substantial evidence" of effectiveness.[3]

PMA has advanced four grounds for challenging the validity of the September regulations. First, PMA contends that the Commissioner exceeded his authority in substantially restricting the evidence which may be offered to establish the effectiveness of a drug product. Second, even assuming that the Commissioner has authority to promulgate the definition of substantial evidence set forth in the September regulations, PMA asserts that to apply the new requirements, without the Commissioner indicating the drugs whose effectiveness are in question and without affording an adequate period to carry out the testing required by the regulations before removing the drugs from the market, amounts to arbitrary and capricious administrative action. Third, PMA claims that the Commissioner, by requiring the presentation of substantial evidence of a drug's effectiveness as a *condition* for obtaining

a hearing, has impermissibly restricted the statutory right to a hearing to challenge the removal of a drug product. Finally, PMA contends that the regulations are invalid because they were issued without notice and opportunity for comment in violation of the requirements of Section 4 of the Administrative Procedure Act, 5 U.S.C. § 553.

After reviewing the memoranda and affidavits submitted and after hearing the arguments of counsel, it appears that PMA's fourth contention is well taken and determinative of the present controversy between the parties as to the validity of the September regulations.

■■ As a threshold consideration, this Court finds (a) that it has the jurisdictional power under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, and the Administrative Procedure Act, 5 U.S.C. § 704, to examine the validity of the September regulations and (b) that the controversy is ripe for judicial determination because the regulations represent final agency action, the issues raised with respect to them are purely legal, the regulations have a direct and immediate impact upon PMA's members and the challenge is not calculated to delay or impede the effective enforcement of the Act. Abbott Laboratories v. Gardner, 387 U.S. 136, 143–149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967).

Section 4 of the Administrative Procedure Act, 5 U.S.C. § 553, requires that rule-making by an agency be preceded by "general notice of proposed rule-making" in the Federal Register at least thirty days before the effective date of the proposed rule, and further requires that the agency afford interested persons "an opportunity to participate in the rule making through submission of written data, views or arguments with or without opportunity for oral presenta-

3. The criteria set forth in § 130.12(a) (5) (ii) (*a*) of the September regulations provide for controls in which the drug tested is compared with an inactive placebo or, when placebo therapy would be unethi-

cal, with another active drug. In rare instances, an "historical control" is permitted, in which the drug tested is compared with prior experience.

tion." That procedure was not followed in this case. The September regulations were made effective by the Commissioner upon their publication in the Federal Register without prior notice or an opportunity for submission of comments by interested parties.

■■ Exempt from the general requirements of notice and opportunity for comment are "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b) (A). The Commissioner has characterized the September regulations as "procedural and interpretative" and thus contends that they fall within the exception to the notice and comment requirement. But the label placed on the September rules by the Commissioner does not determine whether the notice and comment provisions are applicable. As the Supreme Court has emphasized, in holding that a regulation of the Federal Communications Commission constituted an order subject to judicial review, "[T]he particular label placed upon it by the Commission is not necessarily conclusive, for it is the substance of what the Commission has purported to do and has done which is decisive." Columbia Broadcasting System, Inc. v. United States, 316 U.S. 407, 416, 62 S.Ct. 1194, 1200, 86 L.Ed. 1563 (1942).

■ Attempting to provide a facile semantic distinction between an "interpretative and procedural" rule on the one hand and a "substantive" rule on the other does little to clarify whether the regulations here involved are subject to the notice and comment provisions of Section 4 of the Administrative Procedure Act. Rather that determination must be made in the light of the basic purpose of those statutory requirements. The basic policy of Section 4 at least requires that when a proposed regulation of general applicability has a substantial impact on the regulated industry, or an important class of the members or the products of that industry, notice and opportunity for comment should first be provided.

In Texaco, Inc. v. Federal Power Commission, 412 F.2d 740 (C.A.3, 1969), the FPC had issued an order, without opportunity for notice and comment, requiring the payment of interest "compounded monthly" on refunds ordered by the FPC. The order established a mandatory policy affecting all sellers of natural gas subject to regulations under Section 4(c) of the Natural Gas Act, 15 U.S.C. § 717c(e).[4] In rejecting the FPC's argument that notice and comment were "unnecessary" under the exception in Section 4, the Court of Appeals pointed out that Section 4 "enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." 412 F.2d 740, 744.

Judge McGowan of the Court of Appeals for the District of Columbia emphasized the same governing principles in an opinion for a three-judge district court in National Motor Traffic Ass'n v. United States, 268 F.Supp. 90, 95–97 (D.D.C.1967), aff'd 393 U.S. 18, 89 S. Ct. 49, 21 L.Ed.2d 19 (1968). His opinion further rejects the notion that regulatory agency labels should govern, and holds that the notice and comment requirements of Section 4 should be complied with whenever an administrative agency takes new regulatory action of general importance to the regulated industry and to the public. See also NLRB v. Wyman-Gordon Co., 394 U.S. 759, 764, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (plurality opinion); Seaboard World Airlines, Inc. v. Gronouski, 230 F.Supp. 44, 46 (D.D.C.1964).

4. The Court of Appeals noted that the "compound rate would affect numerous jurisdictional natural gas companies and potentially involves large sums of money" 412 F.2d 740, 743. Measured by the number of companies involved and the total expense to these companies, the impact of the September regulations in this case appears far more substantial than the impact of the interest regulation in *Texaco*, supra.

The September regulations, which prescribe in specific detail, for the first time, the kinds of clinical investigations that will be deemed necessary to establish the effectiveness of existing and future drug products and which require that such evidence be submitted as a condition to avoiding summary removal from the market, are pervasive in their scope and have an immediate and substantial impact on the way PMA's members subject to FDA regulation, conduct their everyday business. The regulations apply to more than 2000 drug products first marketed between 1938 and 1962 with FDA approval and place all of them in jeopardy, subject to summary removal by order of FDA.

The all pervasive and substantial impact which the September regulations have upon the drug industry and in turn upon prescribing physicians and their patients, makes it imperative that the Commissioner comply with the notice and comment provisions of Section 4 before such regulations become effective.

In contending that he was not obligated to give notice and opportunity for comment, the Commissioner does not deny that compliance with the testing requirements of the September regulations will have a substantial and pervasive effect on the drug industry. Rather, the Commissioner argues that the testing standards of the September regulations are not new and that any burden imposed by them is the direct result of the "substantial evidence" of effectiveness requirements embodied in the 1962 amendments to the Act. Thus, the Commissioner concludes that the only effect of the September regulations was to "particularize" the statutory standard.

Despite this argument, the record is clear that the administrative practice applying the statutory standard to drugs marketed before 1962 has not uniformly insisted on evidence produced in accordance with the carefully controlled testing requirements of the September regulations. For example, in promulgating "prescription drug advertising regulations," the Commissioner has recognized explicitly the relevance of well-documented clinical experience in establishing the effectiveness of drugs that have been approved for marketing between 1938 and 1962. The regulations provided that advertisements for prescription drugs covered by the new drug applications that became effective before October 10, 1962 may recommend or suggest uses contained in labeling in commercial use on October 9, 1962 "for which there exists substantial clinical experience, adequately documented in medical literature or by other data * * *, on the basis of which it can fairly and responsibly be concluded by qualified experts that the drug is safe and effective for such uses." 29 Fed.Reg. 257 (1964). These advertising regulations are still in effect. 21 CFR § 1.105(e) (4) (i) (b) (2) referring to § 1.105(e) (4) (iii) (c).

Second, at conferences held with representatives of the drug industry between 1963 and 1964, FDA officials gave assurances that well-documented clinical experiences, on the basis of which experts could fairly and reasonably conclude that a drug was effective, would be considered by the Commissioner in determining the effectiveness of drugs approved for marketing between 1938 and 1962.

Third, the guidelines [5] established by the Policy Advisory Committee of the NAS-NRC for the effectiveness review specifically contemplated that information freely available in scientific literature as well as "the informed judgment and experience of the members of the panels" would be relied upon in reaching judgments as to the relative effectiveness of the drug products evaluated. The guidelines also envisioned that "there will likely be cases in which a Panel is in

5. NAS-NRC Guidelines, IX-D (1966), reprinted in CCH Food, Drug, Cosmetic Law Reporter, 1963-1967 Transfer Binder Par. 80,146.

doubt as to the sufficiency of evidence of effectiveness of a drug that has gained repute among practicing physicians or that has been in wide use for a period of years. It will be quite in order for the Panel to draw attention to these facts in recording its judgment as to effectiveness."

Fourth, requests for information from manufacturers to support their claims of effectiveness for drugs marketed between 1938 and 1962, printed in the Federal Register, called in general terms for a broad range of data, literature references and unpublished articles. This request for supporting data did not indicate that consideration of the effectiveness of pre-1962 drugs was to be limited to evidence derived solely from closely controlled clinical investigations of the kind required by the Commissioner in the September regulations. See 31 Fed.Reg. 942, 13014 (1966).

Fifth, the final report of the NAS-NRC Panels clearly shows that evidence produced through other than the well-controlled tests required by the September regulations was relied on by the Panel members in evaluating the effectiveness of the drug products.[6]

In light of the administrative practice outlined above, the Commissioner is incorrect in asserting that before September 1969 there was a uniform understanding concerning the range of evidence which could be offered to support a claim of drug effectiveness for a drug marketed before 1962.[7] The above discussion indicates that the September regulations did effect a material narrowing of the range of evidence which previously had been considered relevant in evaluating a drug's efficacy. Because of the important clarification of acceptable testing standards effected by the September regulations and because of the substantial impact of these regulations on the drug industry, the Commissioner should have issued these important regulations only after providing notice and opportunity for comment.

The considerable confusion and controversy in this proceeding in regard to the feasibility, impact, and basic validity of the September regulations indicate that affording notice and opportunity for comment would have been especially appropriate. Many of the important issues now raised by PMA in this Court are matters which require thorough and expert consideration by the Commissioner. For example, PMA asserts that it would be difficult, if not impossible, to employ sufficient research investigators to perform the extensive testing required by the September regulations for all drug products currently marketed, especially because many trained clinicians are not interested in testing drugs which have been marketed for a long period of time and accepted by the medical profession as effective.[8] Claims concerning the

---

6. Drug Efficacy Study: A Report to the Commissioner of Food and Drugs from the Division of Medical Sciences National Research Council, National Academy of Sciences, Washington, D.C. 1969, pp. 8–9.

7. Further support for this conclusion is provided in a preliminary draft of the Kinslow Report, an evaluation of the effectiveness of the consumer protection program of the FDA. The report observes that "Current information and educational services [of the FDA] are inadequate. They fail to establish, in concert with industry, general guidelines for clinical studies and to disseminate these to industry and to individual investigators. Currently, there is confusion in industry with regard to FDA's requirements for studies, not only in general, but with respect to classes of drugs. In addition, requirements vary among the Divisions of the Bureau of Medicine. With the exception of the oral contraceptives and a few other drugs, there has been no dissemination of detailed labeling guidelines to industry and to the field Districts." Report from the Study Group on the Food and Drug Administration, Consumer Protection, Objectives and Programs Draft, July, 1969, page 21.

8. The final report of the National Academy of Sciences to the Commissioner of Food and Drugs, summarizing and evaluating the conduct of the drug efficacy study which the NAS–NRC panels performed

scarcity of testing resources, and their proper allocation among competing uses are, of course, matters requiring the special expertise and judgment of the Secretary and the Commissioner. If PMA's claim here, as supported by the Final Report of the Drug Efficacy Study, is essentially correct, then it must be recognized that judgments concerning allocation of such scarce resources involve very difficult and fundamental policy determinations for the Commissioner. If a drug has been found effective by a panel of the NAS-NRC, then a determination by the Commissioner that immediate further testing was required for this drug would necessarily tend to displace testing resources from the development of new drugs for important and presently unfulfilled therapeutic needs. Determinations of such sensitivity and importance of course are for the Commissioner and not the Court. The existence of such important questions, however, certainly suggests that the Commissioner has the responsibility to fully inform himself concerning these and other important implications of the September regulations.

The relationship of the NAS-NRC Panel studies to the standards and procedures of the FDA for judging the efficacy of drug products has, unfortunately, never been fully clarified. As pointed out in the above discussion of prior administrative practice, the guidelines established for the NAS-NRC Panels and submissions accepted from the pharmaceutical industry were not

limited to evidence produced by strictly controlled tests as now required by the September regulations.

Further confusion exists because the findings of the NAS-NRC Panels regarding the effectiveness of more than 2800 drug products have not been fully released to the drug manufacturers, even though all panel reports were submitted to the Commissioner over six months ago. While the Commissioner asserts that it would create serious confusion to release all these panel reports immediately, the drug companies have indicated substantial concern about the possible future action which may be taken against their drug products based on these unreleased panel reports. This concern has become magnified in regard to the possible need to begin further testing in order to comply with the standards promulgated in the September regulations. Individual drug manufacturers wish to know the Panel's decision at this point in order to make some judgment as to the feasibility and value of conducting such testing in order to protect the marketability of a drug product.

In regard to the question whether further time would be allowed for testing after the issuance of particular NAS-NRC Panel reports, counsel for the Commissioner stated at oral argument that "we have established a policy of allowing a six months time for the 'possibly effective' and a twelve months time for the 'probably effective' and that people have asked for and obtained extensions of some of those times." (Tr. 38).[9]

for the Commissioner, provides substantial support for plaintiff's contention. After noting that "searches of the medical literature indicated that there existed little convincing scientific evidence to support many of the cited indications for the use of drugs that are currently in good standing in medical practice," the report stated: "There is every reason to believe that the industry is aware of the need for, and seeks to obtain the best scientific endorsement of its products. The failure, therefore, must be attributed to the difficulty that industry has in commanding the needed clinical facilities and the services of experienced investigators.

This is not a fault of industry alone, but rather is a reflection of a serious gap in the program and management of the national effort in therapeutic research." Drug Efficacy Study: A Report to the Commissioner of Food and Drugs from the Division of Medical Sciences National Research Council, National Academy of Sciences, Washington, D.C. 1969, p. 13.

9. The judgments of the NAS-NRC Panels were based on the following criteria:
   (1) Factual information freely available in the scientific literature,
   (2) Factual information from the FDA from the manufacturer or other sources, or

PMA points out that because of the flexible guidelines followed by the NAS-NRC Panels a rating of "effective" may have been assigned to a particular drug based on a substantial concensus of medical experience and usage even though substantial evidence of the kind required by the September regulations was not relied on in reaching this conclusion. As stated by PMA "the September 19th regulations, read literally permit [the] FDA to remove from the market for failure to meet the clinical testing standards of the September 19th regulations, even those drugs found 'effective' by the NAS-NRC Panels." [10] Especially in regard to drugs which have been found effective by the NAS-NRC Panels the manufacturers desire clarification of

(3) The experience and informed judgment of the members of the Panel.
On the basis of these criteria, the Panels placed a drug in one of four categories according to its relative effectiveness. These four categories were stated as follows:

"Category A—*Effective*. For the presented indication, the drug is effective on the basis of the criteria stated above.

Category B—*Probably Effective*. For the indication presented, effectiveness of the drug is probable on the basis of the criteria stated above, but additional evidence is required before it can be assigned to Category A. The recommendation to the FDA [by the Panel] could be for further research or for modification of claims or both.

Category C—*Possibly Effective*. In relation to the indication in question, there is little evidence of effectiveness under any of the criteria stated above. The possibility that additional supporting evidence might be developed should not be ruled out, however. The recommendations to the FDA [by the Panel] could be that unless it is informed that studies are being initiated promptly with the object of developing substantial evidence of effectiveness, the indication in question should be considered inappropriate.

"Category D—*Ineffective*. In relation to the indication in question, the Panel concludes that there is no acceptable evidence under any of the criteria stated above to support a claim of effectiveness. If there is clear evidence of ineffectiveness, the Panel should cite it. The recommendations to the FDA could be that no useful purpose is served by continuing to make this product available for the indication in question, and that immediate administrative action would appear to be justified. The number of completely worthless drugs is probably not large, and these are probably concentrated primarily among certain drug groups. The major use of this category, therefore, would probably be in relation to ancillary indications claimed for a larger number of basically useful drugs.

The indications referred to in these definitions correspond with the reference that is made in the law to 'the effect the drug purports or is represented to have under the conditions of use prescribed, recommended or suggested in the proposed labeling.' This is to say that the indications are the claims that are cited in the labeling of a given drug."

As the study progressed, two more categories were added by the NAS–NRC Panels to complement the four categories first suggested in the guidelines. These ratings were "effective, but * * *, and" and "ineffective as a fixed combination". The first of these came to be the preferred rating for drugs for which there was substantial evidence that they did what they were claimed to do, but, nevertheless, were no longer approved forms of treatment because much better, safer or more conveniently administered drugs had become available. This rating also was used by some panels to draw attention to vaguely worded or misleading claims. The rating "ineffective as a fixed combination" was used to deal with certain combinations of drugs, notably combinations of two or more antibiotics, one or more of which when administered alone is acknowledged to be effective for the cited indication. It is a basic principle of medical practice that more than one drug should be administered for the treatment of a given condition only if the physician is persuaded that there is a substantial reason to believe that each drug will make a positive contribution to the effect he seeks. Drug Efficacy Study: A Report to the Commissioner of Food and Drugs from the Division of Medical Sciences National Research Council, National Academy of Sciences, Washington, D.C. 1969, pp. 7 to 8.

10. PMA's Reply Br. p. 5.

868

their immediate and future obligation to conduct testing of the kind required by the September regulations. The manufacturer of a drug found effective by the NAS-NRC may expect, or at least wish to argue, that further testing of this drug product would not be required until its effectiveness is challenged by the Commissioner.

The program for evaluating the findings of the NAS-NRC Panels and relating those findings to the requirement for further testing of drug products is of course for the responsible determination of the Commissioner. Because of the evident complexity of the scheme in which the Commissioner is now engaged, this Court believes that the administrative procedures required by Section 4 of the Administrative Procedure Act would at the very least provide an opportunity for clarifying some of the difficult matters and problems which, if unresolved, may impede effective enforcement of the Food and Drug Act.

The Court is not suggesting that the Commissioner must, or even should consider the particular problems stated above, and the Court certainly does not presume to tell the Commissioner the kind of balance he should strike in considering these various, competing interests. These problems are pointed out simply to illustrate the necessity of giving notice and opportunity for comment before a regulation of such pervasive impact as here involved is finally issued. Because the minimal procedural rights of notice and opportunity for comment were not afforded in the present case, the promulgation of the September regulations was invalid and a preliminary injunction will be granted.

The above constitute findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

Present an order, on notice, in accordance with this Opinion.