**PHARMACEUTICAL MANUFACTUR-ERS ASSOCIATION, Plaintiff,**

v.

**Elliot L. RICHARDSON, Secretary of Health, Education, and Welfare, and Charles C. Edwards, Commissioner of Food and Drugs, Defendants.**

**Civ. A. No. 3946.**

United States District Court,
D. Delaware.

Oct. 20, 1970.

Alexander L. Nichols and David A. Drexler, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Lloyd N. Cutler and Daniel Marcus, of Wilmer, Cutler & Pickering, Washington, D. C. and Bruce J. Brennan, Washington, D. C., of counsel, for plaintiff.

F. L. Peter Stone, U. S. Atty., Wilmington, Del., John J. Murphy, Chief Administrative Regulations Section, Howard S. Epstein, Atty. of the Dept. of Justice, Washington, D. C., and William W. Goodrich, Asst. Gen. Counsel, Joanne S. Sisk and Eugene M. Pfeiffer, Attys. of the Dept. of Health, Education

and Welfare, Washington, D. C., of counsel, for defendants.

## OPINION

LATCHUM, District Judge.

In this action for declaratory and injunctive relief, the Pharmaceutical Manufacturers Association ("PMA"), on behalf of its members, seeks a preliminary injunction restraining the Secretary of Health, Education and Welfare ("the Secretary") and the Commissioner of Food and Drugs ("the Commissioner") from taking any action in reliance upon the regulations promulgated in the Commissioner's Order of May 8, 1970 ("the May regulations"), 35 Fed.Reg. 7250. The defendants oppose the issuance of a preliminary injunction and also move for summary judgment of dismissal on the ground that the May regulations are clearly justified.

The May regulations establish standards of evidence necessary to demonstrate the effectiveness of drug products by defining the scientific content of adequate and well-controlled clinical investigations and also set forth the procedural requirements for obtaining an evidentiary hearing in any proceeding to amend the antibiotic certification regulations or to withdraw approval of a new drug application on the ground of lack of substantial evidence of effectiveness. The May regulations are a direct outgrowth of regulations previously issued by the Commissioner on September 19, 1969 ("the September regulations"), 34 Fed.Reg. 14596. In prior litigation in this Court between the same parties, the September regulations were held to be invalid on the ground that they had been issued without prior notice or an opportunity for interested parties to comment as required by section 4 of the Administrative Procedure Act, 5 U.S.C. § 553. Pharmaceutical Manufacturers Association v. Finch, 307 F.Supp. 858 (D. Del.1970).

Two purely legal questions are raised by the present action:[1] (1) May the Commissioner validly establish criteria for adequate and well-controlled clinical investigations necessary to demonstrate the effectiveness of drug products already on the market and (2) does the summary procedure specified in the May regulations comport with the Act and the requirements of due process?

The Court finds (a) that it has the jurisdictional power under 28 U.S.C. §§ 1331, 1337 and 2201 to examine the validity of the May regulations and (b) that the controversy is ripe for judicial determination because the regulations represent final agency action, the two issues raised are purely legal in nature, no genuine issue of material fact is in dispute, the regulations have a direct and immediate impact upon PMA's members and the challenge is not calculated to delay or impede the effective enforcement of the Act. Abbott Laboratories v. Gardner, 387 U.S. 136, 148–156, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967); Toilet Goods Ass'n v. Gardner, 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967).

### The Drug Amendments Of 1962

The relevant provisions of the Federal Food, Drug and Cosmetic Act ("the Act"), 21 U.S.C. § 301 et seq., governing the marketing of drug products may be summarized as follows:

Under section 505 of the Act, 21 U.S. C. § 355, a "new drug" can be marketed only if the Food and Drug Administration ("the FDA") has approved a new drug application covering that product. Most prescription drugs now on the market were new drugs when first developed and therefore are or have been the subject of approved new drug applications. Antibiotic drugs are marketed under a separate statutory scheme, embodied in section 507 of the Act, 21 U.S.C. § 357.

---

1. The same basic questions were raised in the prior litigation in this Court in Pharmaceutical Manufacturers Association v. Finch, supra, with respect to the September regulations but were not resolved because the Court found those regulations invalid on other grounds.

From 1938, when the Act was first enacted, until 1962, section 505 contained no requirement that a new drug be shown to be effective before a new drug application for the product was approved; only the safety of the drug had to be established by the drug company. Similarly, under section 505(e), an approved new drug application could be suspended, after notice and opportunity for hearing, on the ground that the drug had been shown to be unsafe, but not because it was ineffective. 52 Stat. 1052, 1053 (1938).

In 1962 Congress amended section 505 of the Act to require that any new drugs be shown to be effective as well as safe before being approved for marketing. That section also required claims of effectiveness for a drug to be supported by "substantial evidence." Thus, as a result of the 1962 amendments, approval of a new drug application may be refused, if after notice and opportunity for hearing, the FDA finds there is a "lack of substantial evidence" that the drug is effective for its recommended use. § 505(d), 21 U.S.C. § 355(d). Similarly, section 505(e), as amended, 21 U.S.C. § 355(e), authorizes the Secretary to withdraw approval of a new drug application (including those approved before the adoption of the 1962 amendments) if, after notice and an opportunity for hearing, he finds "on the basis of new information before him with respect to such drug, evaluated together with the evidence available to him when the application was approved, that there is a lack of substantial evidence that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended or suggested in the labeling thereof. * * *"

The term "substantial evidence" is defined in section 505(d) of the Act, 21 U.S.C. § 355(d), to mean—

"evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof."

Antibiotic drugs are marketed under a separate procedure provided in section 507 of the Act, 21 U.S.C. § 357. That section, which provides for batch certifications of certain antibiotic drugs, has contained a requirement of efficacy as well as safety since its original enactment in 1945. Before 1962, however, section 507 applied only to certain named antibiotics.[2] Before 1962, drug products containing other antibiotics were subject to the new drug provisions of section 505 which did not require a showing of effectiveness. When Congress amended section 507 in 1962 to cover all antibiotic drugs, antibiotics previously marketed under section 505 were "transferred" to section 507. Section 507(h), added by the 1962 amendments, directed that initial regulations for certification of such antibiotics be established without the need for an affirmative finding of efficacy. That subsection further provides, however, that the regulations for the certification of those drugs may subsequently be amended or repealed by the Secretary after he makes a finding on a basis similar to that required in section 505(e), discussed above, that there is lack of substantial evidence of the effectiveness of the antibiotic drug. The procedure to amend or repeal antibiotic regulations also provides for notice of the proposed action, an opportunity to present views and a hearing on objections stating "reasonable grounds" in opposition to any final order amending or repealing the regulation. § 507(f), 21 U.S.C. § 357(f).

---

2. Penicillin, streptomycin, chlortetracycline, chloramphenicol, bacitracin, and derivatives of those drugs. 59 Stat. 463; 61 Stat. 12; 63 Stat. 409; 67 Stat. 389.

*The NAS–NRC Drug Efficacy Study*

Pursuant to the 1962 amendments, the FDA determined to undertake a review of the claims of effectiveness for all drugs approved for marketing between 1938 and 1962. Because of the magnitude of the undertaking and the fact that the resources of the FDA were fully extended in keeping up with the evaluation of currently filed new drug applications,[3] the FDA on June 17, 1966 entered into a contract with the National Academy of Sciences-National Research Council ("the NAS–NRC") for the conduct of such a review, and invited drug manufacturers to submit to the NAS–NRC data to support their claims of effectiveness. Thirty panels of physicians were selected by the NAS–NRC, each composed of six experts in a particular field of drug therapy, to review the claims. The review extended over a two-year period and some 4000 drug formulations marketed by 237 firms were examined and reports of the panel findings were made to the FDA. The panels found a considerable number of the drugs effective, about 7% ineffective or ineffective as fixed combinations, and the majority received varying findings of "probably effective", "possibly effective", "effective but", and effective for some of the numerous claims made in each drug's labeling.

*The Commissioner's Actions*

After reviewing the panel findings, the Commissioner has either concurred or disagreed and from time to time has published in the Federal Register on a product-by-product basis summaries of the conclusions of the NAS–NRC with respect to particular drugs. In several instances in the past on the basis of the conclusions of NAS–NRC panels, the FDA has initiated action to remove products from the market for lack of substantial evidence of effectiveness.

After setbacks in two separate efforts to remove from the market certain antibiotic drugs before acting on objections filed by the affected parties,[4] the Commissioner promulgated, on September 19, 1969, regulations designed to facilitate the implementation of the NAS–NRC effectiveness review. 34 Fed.Reg. 14596. Apparently, the questioned theories of the FDA in those two cases gave rise to the September regulations. Those regulations, issued without notice or opportunity for comment and made effective immediately, described, for the first time, the kind of evidence that the FDA would deem necessary to meet the requirements of "substantial evidence of effectiveness." They defined "substantial evidence" solely in terms of "adequate and well-controlled clinical investigations", spelled out the criteria for such investigations, and dismissed as irrelevant all other clinical evidence. Further, the drug manufacturer affected was required to show reasonable grounds for a hearing by presenting studies to the FDA which fully met the criteria for an adequate and well-controlled investigation of the kind spelled out by the regulations.

---

3. There were some 7000 drug formulations that had been marketed under new drug applications approved between 1938 and 1962 and it was estimated that about 4000, involving some 300 distinct chemical entities, were still on the active market. The FDA was also receiving between 100 and 200 new drug applications currently in 1966. Drug Efficacy Study: Final Report to the Commissioner of Food and Drugs, FDA from the Division of Medical Sciences, National Research Council, National Academy of Science, Washington, D.C., 1969, pp. 1–2.

4. Upjohn Company v. Finch, 303 F.Supp. 241 (W.D.Mich.1969); American Home Products Corp. v. Finch, 303 F.Supp. 448 (D.Del.1969). In both cases the Court enjoined the FDA from ordering the products involved removed from the market until 30 days after ruling whether objections filed by the parties stated "reasonable grounds" for hearing. While not deciding the issues both Courts indicated concern that the FDA was requiring the parties to prove to its satisfaction that the evidence in support of their drugs' effectiveness met the statutory requirement of "adequate and well-controlled" investigation as a condition to obtaining a hearing on that issue.

This Court in Pharmaceutical Manufacturers Association v. Finch, supra, held the September regulations were invalid on the ground that, contrary to the requirements of section 4 of the Administrative Procedure Act, 5 U.S.C. § 553, they were issued without notice of proposed rule making and an opportunity for interested persons to comment. In so holding, the Court found that the September regulations represented a substantial departure from past agency practice and policy concerning the range of evidence which could be offered to support a claim of drug effectiveness for drugs marketed before 1962, that the regulations had an immediate, substantial and pervasive impact on the drug industry, and that many of the issues raised in the lawsuit and the confusion engendered by the regulations were questions and problems that merited the consideration of the FDA, after notice and opportunity for comment, before such regulations became effective.

In response to the decision in Pharmaceutical Manufacturers Association v. Finch, supra, the Commissioner on February 17, 1970 published proposed regulations ("the February proposals") for comment by interested parties. 35 Fed. Reg. 3073. The February proposals were similar in material content to the September regulations. A number of parties, including PMA, filed comments on the February proposals.[5] The comments of PMA to the FDA appeared to agree that the criteria for adequate and well-controlled clinical investigations were scientifically sound for entirely new drugs, but argued that the regulations should state these principles in the form of guidelines applicable to current and future clinical investigations.[6] Four other objections to the February proposals

were also made: (1) that a lesser standard of proof based on clinical experience and investigation not made in conformity with the proposed regulations should be accepted for drugs approved for marketing before 1962; (2) that firms should be given additional time to conduct definitive tests which meet the proposed requirements before proceedings are initiated to withdraw pre-1962 drugs from the market; (3) that testing most pre-1962 drugs is wasteful of testing resources and could not be carried out because of a shortage of clinical investigators and (4) that the proposed hearing regulations violated due process of law.

On May 8, 1970, the Commissioner published an Order in the Federal Register discussing and disposing of the comments of PMA and other parties, and issued final regulations which were made effective on publication. 35 Fed.Reg. 7250; codified in 21 CFR, Parts 130 and 146.

*The Issue Of Substantial Evidence*

PMA first challenges the May regulations on the ground that they arbitrarily define "adequate and well-controlled clinical investigations" so narrowly and *rigidly as to be incompatible with the* statutory definitions of "substantial evidence of effectiveness" as elucidated by the legislative history of the 1962 Drug Amendments. Its argument runs that Congress, in adding the new tests of effectiveness, intended no rigid and narrow standard as to the nature of the evidence necessary to establish effectiveness and that the very concept of "substantial evidence" was designed to reflect and accommodate the fact that clinical experts often disagree as to the effectiveness of a drug. Hence, it is contended that the statutory standard was

5. The FDA received comments from PMA, another trade association, fifteen drug firms and one professor of pharmacology. 35 Fed.Reg. 7250.

6. PMA stated: "There is very little dispute, at this stage of the development of clinical investigation techniques, principles of the kind set forth in the Order can

be helpful guidelines in setting up, conducting and evaluating clinical investigations now and in the future. Undoubtedly, even more advanced principles will be developed as testing knowhow improves. They, too, should be applied to trials commenced after their development, when appropriate."

designed to insure that any drug "believed by a substantial number of experts" to be effective could be marketed even if the view of the majority of experts was that the drug was ineffective. The Court is unable to agree with this contention.

First, the legislative history of the drug amendments of 1962 does not support PMA's view. The 1962 amendments were the culmination of an investigation into administered prices in the drug industry by the Subcommittee on Antitrust and Monopoly, Senate Committee on the Judiciary, under the Chairmanship of Senator Kefauver. Beginning in 1960, the Subcommittee heard a succession of witnesses respecting the testing of all drugs.

Dr. Charles D. May, Professor of Pediatrics, New York University School of Medicine, testified to the "fallacy" of assuming that "a collection of impressions" will furnish the truth, pointing out that "this approach did not prevent doctors from having unbounded faith in the curative powers of leeches for hundreds of years before scientific evaluation became the preferred means of judging efficacy of therapy." He testified that "[t]he magnitude of sales of a drug after vigorous promotion is no recommendation for its usefulness or efficacy"; [7] and recommended that "the present concept of controlled methods of evaluation of drugs" be employed to determine efficacy.[8]

Dr. Louis Goodman, Professor of Pharmacology, University of Utah College of Medicine, and co-author of the medical textbook, "The Pharmacological Basis of Therapeutics," likewise pointed out the need for controlled clinical testing. He said that those who had seen "the mass of laboratory and clinical information submitted to the FDA, even by the very best drug houses * * * are repeatedly dismayed by the welter of anecdotal case reports and uncontrolled clinical studies * * *." [9] Dr. Goodman insisted that there must be "basic, original, clinical evidence that [a] drug is a useful drug and that the claims made by the manufacturer are valid," stating that "the individual practicing doctor cannot be the judge." [10]

Dr. Harry F. Dowling, Professor and Head of the Department of Medicine, University of Illinois, testified on the need for minimizing patient and investigator bias, on "the placebo effect", and on "double-blinding." He emphasized that comparative analysis between patient groups is necessary in order to determine that beneficial changes in the patients are due to the drug rather than to mere chance. He said, "The proposed bill would make sure that the proper tests had been done and that a summary of this information was available to [the individual physician] at the same time that the drug was placed on the market." [11]

The concept of a well-controlled clinical investigation also found support from the drug manufacturers. Eugene N. Beesley, President of Eli Lilly & Co., and then Chairman of PMA, said: "The Pharmaceutical Manufacturers Association believes strongly that a drug should be effective for the uses which the manufacturer claims for it. Therefore, we support the principle that, before introducing a new drug, the manufacturer should be required to submit to the Food and Drug Administration substantial evidence not only that the drug is safe but also that it produces the results

7. "Drug Industry Antitrust Act," Hearings before the Subcommittee on Antitrust and Monopoly, Senate Judiciary Committee, 87th Cong., 1st Sess., part 1, p. 195.

8. Hearings, part 1, p. 196; Dr. May's statements are supported by other experts in drug testing, including Dr. Louis Lasagna, head of Division of Clinical Pharmacology at the Johns Hopkins Hospital (pp. 282–283) and Dr. Allen M. Butler, Professor of Pediatrics, Harvard Medical School (p. 355).

9. Hearings, part 1, p. 215.

10. Hearings, part 1, p. 243.

11. Hearings, part 1, p. 412.

claimed." [12] Mr. Beesley also stated, "Whenever effectiveness is to be considered in passing on a new drug application, the test of effectiveness is to be whether the drug will produce the specific effects asserted by the manufacturer." [13]

Summarizing this kind of testimony, the Subcommittee noted that "[t]he experts emphasized the imperative need for an objective determination of efficacy of the drug products placed on the market," [14] and it was against this background that the "substantial evidence" rule emerged from the Senate Committee. It was recognized that proof of drug efficacy, as well as safety, would be necessary, and on July 19, 1962, the Senate reported out a bill designed "to strengthen the laws designed to keep unfit drugs off the market in the first instance and speed their removal should they reach the market." [15] An amendment to section 505 of the Act authorized the suspension of a new drug application "upon a finding that there is a lack of substantial evidence * * * that it will have the effect claimed for it." [16]

However, before the bill was acted upon, President Kennedy proposed additional amendments to expand the coverage of the bill. Senator Kefauver, in reporting the proposed amendments to the Senate, stated that they would "go a long way toward insuring the American people that any drug which they purchase is safe and effective and has been manufactured in plants which have been adequately inspected." [17]

In regard to the provisions of the bill dealing with efficacy, President Kennedy's recommendations pointed out that an *undefined* standard of "substantial evidence" of effectiveness was "inadequate in terms of assuring that drugs that reach the market have been shown to be effective for the claims made for them." [18] Critical to the effectuation of the bill's purpose was an amendment that would allow the withdrawal of a drug previously approved upon a finding, *inter alia*—

"that there is a substantial doubt as to the safety or effectiveness of such drug, for use under the conditions of use upon the basis of which the application was approved." [19]

Confronted with the President's suggestions and the Committee members' concern over the thalidomide tragedy, the Judiciary Committee again met "to give further special consideration to the adequacy of the present provisions of the Food and Drug Act" from a safety and efficacy standpoint.[20] The Committee was of the opinion that "with [the] change [it then proposed] the legislation will insure the reliability of drugs." [21]

Among the changes adopted by the Judiciary Committee was the requirement "that all claims for effectiveness, whether made initially in a new-drug application or at any time thereafter, must be supported by 'substantial evidence' * * *." [22] The Committee also reported that the bill had been amended to set forth a new test of effectiveness. They explained its meaning as follows: [23]

"(b) *Test of Effectiveness*

The proposed committee amendment clarifies and strengthens the previous-

---

12. Hearings, part 4, p. 1996; see also pp. 1997–1999.

13. Hearings, part 4, p. 1997; see also 1962 U.S.Code Cong. & Adm.News, pp. 2920–2922.

14. Senate Report No. 448, 87th Cong., 1st Sess., p. 187.

15. Senate Report No. 1744, 87th Cong., 2d Sess., part 1, p. 8.

16. Ibid., part 1, p. 16; 1962 U.S.Code Cong. & Adm.News, p. 2892.

17. 108 Cong.Rec. 15693 (Aug. 6, 1962) (Daily Edition).

18. 108 Cong.Rec. 15696 (Aug. 6, 1962) (Daily Edition).

19. Idem.

20. Senate Report No. 1744, 87th Cong., 2d Sess., part 2, p. 1.

21. Idem.

22. Ibid., part 2, p. 5.

23. Ibid., part 2, p. 6.

ly reported bill by restating and carefully defining the quality and quantum of evidence which the Secretary must find to exist as a basis for clearance of the drug or for withdrawal of a previously approved new-drug application. In the course of committee deliberations a distinction evolved, in this connection, between two tests—the 'preponderant evidence' test and the 'substantial evidence' test as now specifically defined. Under the former a claim would not be accepted under the new-drug section unless it represented the preponderant view of experts qualified by training and experience in the subject that the claim was supported. The committee recognizes that in the difficult area of drug testing and evaluation there will frequently, if not usually, be a difference of responsible opinion. The committee feels that the existence of such a difference should not result in disapproval of a claim of effectiveness if it is supported by substantial evidence defined in the manner set forth below and evaluated by the Secretary in the light of all the information available to him at the time.

As the result of subsequent study, a definition of 'substantial evidence' has now been added to the bill concerning what would constitute such evidence. The amendment provides that 'substantial evidence' means evidence consisting of adequate and well-controlled investigations, including clinical investigations, by experts qualified by scientific training and experience to evaluate the effectiveness of the drug involved, on the basis of which it could fairly and responsibly be concluded by such experts that the drug will have the effect it purports or is represented to have under the conditions of use prescribed, recommended, or suggested in the labeling or proposed labeling thereof. That is to say, a claim could be rejected if it were found (a) that the investigations were not 'adequate'; (b) that they were not 'well-controlled'; (c) that they had been conducted by experts not qualified to evaluate the effectiveness of the drug for which the application is made; or (d) that the conclusions drawn by such experts could not fairly and responsibly be derived from their investigations.

What the Secretary is required to do is evaluate the claims of effectiveness in the light of the information submitted to him in the new-drug application and any other information before him with respect to such drug and to decide whether there is substantial evidence, as defined above, to support the claim. The question of whether the claim would or would not be allowed would be determined by his evaluation of whether the claim had been supported by substantial evidence as defined above. If on the basis of his evaluation the Secretary finds that the claim is not supported by substantial evidence, as defined above, it will not be allowed; if he finds that it is so supported, it will be allowed, assuming that the labeling of the drug is not false or misleading as explained in the committee's report of July 19, 1962."

This legislative history compels the conclusion that the substantial evidence requirement of the Act was to be applied not only to new drugs coming on the market after 1962 but was to be applied also to the drugs approved for marketing between 1938 and 1962; Congress intended no double standard for determining the effectiveness of drug claims. Further, substantial evidence was defined to mean adequate and well-controlled clinical investigations, i. e., an investigation which was as scientifically sound and objective as it was humanly possible to make.

In a great many instances during the past, drug companies have relied upon testimonials, clinical impressions, practical experience, and unsubstantiated subjective views of medical practitioners as evidence supporting their claims of efficacy for pre-1962 drugs. Obviously, this kind of evidence was hardly the kind

that Congress had in mind when it defined "substantial evidence." Thus, while such clinical experience may be relevant to determining the claim of efficacy of a particular drug, such medical experience derived from random observations, isolated case reports and subjective impressions standing alone cannot meet the objective test of scientifically controlled investigations which Congress intended.

In order to clarify the type of evidence required to support a claim of effectiveness, the May regulations were issued. They definitively spell out the criteria which have developed and been generally recognized by the scientific community, as essentials of adequate and well-controlled clinical investigations.

Turning to the criteria set forth in the May regulations,[24] the first requirement provides that "a clear statement of the objectives of the study" be given. It is simply self-evident that in any study the investigator and evaluator must know what is being studied. This requires, regardless of the manner of the study, that its objective be capable of being understood.

The second requirement provides that (i) the patients selected for study are suitable based on diagnostic criteria of the condition to be treated and, where appropriate, confirmed by laboratory tests; (ii) the subjects are assigned to test groups in such a way as to minimize bias; and (iii) that pertinent variables, such as age, sex, severity, or duration of disease and drugs used are comparable between test groups. The methods used by the investigator to achieve these fundamental objectives are not detailed and are matters of choice left to each investigator to determine depending upon the disease treated, the drug used, and study design chosen.

Requirement three provides that the study contain an explanation of "the methods of observation and recording of results * * * and the steps taken to minimize bias on the part of subject and observer." The fourth requirement provides that the study be comparative with one of four listed known methods of comparison so as to permit quantitative evaluation of the results of the treatment.

The fifth and final criterion requires "a summary of the methods of analysis and evaluation of the data derived from the study."

These criteria for an adequate and well-controlled clinical investigation set forth in the May regulations are minimal requirements for any valid objective study. They provide wide areas of choice for the investigator, and, contrary to PMA's contention, are in no sense unduly rigid and narrow. The regulations appear to be completely reasonable in describing the scientific content of a well-controlled and adequate investigation. In fact compliance with these standards will not necessarily assure that the investigation conducted is valid because the investigator may, among other things, incorrectly select subjects to be tested, inadequately define criteria for diagnosis, improperly assign patients to test groups to minimize bias, choose the wrong method of comparison for therapeutic effect, or employ invalid methods of analysis and evaluation of test data. While conformity with the regulations will not necessarily assure scientific acceptability, the criteria must be observed to give the study a chance to yield meaningful results.

The May regulations simply require a study to show on its face that an investigation has been completed which meets these standards for adequate and well-controlled clinical investigations. Such required studies are designed to afford a greater assurance of objective results and are in contra-distinction to the subjective tests of testimonial, random observations and clinical impressions of physicians which have been relied upon in the past to support claims of efficacy for marketed drugs.

24. 35 Fed.Reg. 7250.

The Court concludes that the criteria of the May regulations are not arbitrarily rigid. On the contrary, they describe broad scientific standards for measuring the adequacy of an investigation of effectiveness while leaving the details of the investigation and study to the evaluator. These criteria appear wholly reasonable and certainly are within the Commissioner's power to issue, particularly since the FDA has found it desirable in the interest of the public health to standardize on a scientific basis the kind of efficacy studies which must be made to support claims of effectiveness for drugs.

Moreover, the May regulations contain some flexibility. In formulating them the FDA was attempting to meet many of the problems noted by the Court in its prior opinion. The drug industry has been put on notice that it should concentrate on efficacy studies for those drugs which the NAS–NRC reports, concurred in by the Commissioner, have evaluated other than "effective." The FDA has set fixed periods for completing such studies which may be extended, if found medically justified. Further, the May regulations concede that other clinical experience may be offered as corroborating evidence of a drug's efficacy but that such type of evidence, standing alone, will not be acceptable. Finally, the regulations provide an administrative procedure to obtain a waiver of some of the criteria if the Director of the Bureau of Drugs finds that such criteria are not reasonably applicable to the investigation and that alternative procedures have been or can be followed which would yield results that can be accepted as substantial evidence of the drug's effectiveness.

■ Consequently, this Court holds that the Commissioner was authorized to issue the May regulations describing the scientific content of adequate and well-controlled clinical investigations and that the criteria therein set forth reasonably carry out the Congressional mandate that all claims of efficacy for marketed drugs must be supported by substantial evidence.

This holding is in accord with the decision in Upjohn Company v. Finch, 422 F.2d 944, 951 (C.A. 6, 1970) where the Court stated that the criteria of the September regulations (very similar to the May regulations) "correctly elucidate what Congress itself has plainly written in its definition of substantial evidence and constitute a correct application of the Congressional definition."

*The Issue Of An Evidentiary Hearing*

PMA's second major challenge of the May regulations is based on the contention that they deny hearing rights guaranteed by the Act and the Constitution. The challenge consists of a two pronged attack.

First, PMA contends that an order withdrawing approval of a new drug application may not be validly entered without a hearing, if the drug manufacturer so elects. It is pointed out that under section 507(f) and (h) of the Act, 21 U.S.C. § 357(f) and (h), governing proceedings for the repeal of regulations providing for the certification of antibiotics, a hearing need be held before a product is removed from the market only when the affected party submits objections stating "reasonable grounds" for a hearing. But PMA argues that section 505(d) and (e), 21 U.S.C. § 355(d) and (e), setting forth the procedures for denying or withdrawing approval of a new drug application, contains no such qualifying language, and that an "opportunity for a hearing" is absolutely guaranteed by section 505(d) and (e) as a condition precedent to a valid order denying or withdrawing approval of a new drug application. Thus, PMA concludes that the provisions of the May regulations which require a showing of "reasonable grounds" in order to obtain a hearing before denial or withdrawal of a new drug application are contrary to the literal language of section 505(d) and (e).

**312**

This contention, however, lacks merit. The "opportunity for a hearing" provided in section 505(d) and (e) does not mean that an evidentiary hearing must be held in every case, even in the absence of genuine factual issues in dispute. It is an established principle of law that an administrative agency, such as the FDA, may by general regulations condition the holding of an evidentiary hearing upon an applicant's preliminary showing that "reasonable grounds" exist therefor dispite any unqualified terms of a statute providing for a hearing. Federal Power Commission v. Texaco, 377 U.S. 33, 84 S.Ct. 1105, 12 L.Ed.2d 112 (1964); United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763, 100 L.Ed. 1081 (1956); Dyestuffs and Chemicals, Inc. v. Flemming, 271 F.2d 281 (C.A. 8, 1959), cert. den. 362 U.S. 911, 80 S.Ct. 681, 4 L.Ed.2d 619 (1960). The Court thus concludes that the FDA as a part of its general rule making power was authorized to require a showing of reasonable grounds as a prerequisite to an evidentiary hearing provided in section 505(d) and (e).

Second, PMA claims that the May regulations illegally authorize the Commissioner to resolve disputed issues of fact to find a basis for denying a hearing. It argues that the summary procedures relating to an evidentiary hearing in the May regulations amount to an impermissible "rule requiring a party to prove his case as a condition to getting a hearing or even to demonstrate that there is a substantial likelihood that he will prevail on the merits." PMA has misconceived the import of these procedural regulations. On the contrary, the May regulations simply provide that a request for an evidentiary hearing will be denied when it clearly appears that the medical documentation, which the hearing applicant is required to submit, shows on its face that there is no genuine and substantial issue of fact which precludes withdrawal of the new

drug approval or repeal of the antibiotic certification regulations, i. e., no adequate and well-controlled clinical investigations have been conducted or identified by the applicant.

As previously noted, the 1962 Drug Amendments require that there be "substantial evidence" to support all claims of effectiveness for drugs. That phrase was defined by Congress to mean "adequate and well-controlled clinical investigations." The scientific criteria that must be met for "an adequate and well-controlled clinical investigation" are set forth in the May regulations. The procedural regulations [25] then require that a request for a hearing must identify and analyze the studies on which the hearing applicant will rely, and provides, that if there are no identifiable investigations meeting the scientific criteria for a well-controlled study, there will be no hearing. These provisions are in accord with existing law.

If no adequate and well-controlled studies exist to support the applicant's claim of effectiveness as required by the Act and regulations, an evidentiary hearing would be a futile exercise and a waste of time. In Upjohn Company v. Finch, 422 F.2d 944 (C.A. 6, 1970), the Court, considering whether a full evidentiary hearing was required before an antibiotic drug could be removed under the September regulations, stated, p. 955:

"* * * we hold that the Commissioner was authorized to demand that a genuine and substantial issue of fact be presented as a prerequisite to an evidentiary hearing—that is, Upjohn be required to demonstrate that it had available and was prepared to present proof of adequate and well-controlled investigations meeting the statutory definition of substantial evidence, in support of its claims for the effectiveness of its drugs."

The Supreme Court in Federal Power Commission v. Texaco, 377 U.S. 33, 84 S.Ct. 1105 (1964) upheld similar regula-

25. 35 Fed.Reg. 7252; codified as 21 CFR, § 130.14(b) and § 146.1(d).

tions of the FPC. In that case the FPC adopted a rule prohibiting certain pricing provisions in the rate schedules of independent producers of natural gas, and subsequently rejected, without a hearing, applications for certificates of public convenience and necessity which contained rate schedules with the prohibited provisions. The Supreme Court upheld the denial of a hearing, saying, p. 39, 84 S.Ct. p. 1109:

" * * * the statutory requirement for a hearing under § 7 does not preclude the Commission from particularizing statutory standards through the rule making process and barring at the threshold those who neither measure up to them nor show reasons why in the public interest the rule should be waived."

Likewise in United States v. Storer Broadcasting Co., 351 U.S. 192, 76 S.Ct. 763 (1956), the Federal Communications Commission amended its rules to provide, in effect, that a license for a television broadcast station would not be granted to any party having an interest in five or more stations. On the day the rules were effective Storer's pending application for an additional station was dismissed on the basis of the amended rule. Storer sought review of the FCC's order, contending that the amended rule conflicted with the mandates of § 309 of the Communications Act that applicants must have a "full hearing." The Supreme Court rejected this contention, stating, p. 205, 76 S.Ct. p. 771:

"We agree with the contentions of the Commission that a full hearing, such as required by [§ 309], would not be necessary on all such applications. As the Commission has promulgated its Rules after extensive administrative hearings, it is necessary for the accompanying papers to set forth reasons, sufficient if true, to justify a change or waiver of the Rules. We do not think Congress intended the Commission to waste time on applications that do not state a valid basis for a hearing. If any applicant is aggrieved by a refusal, the way for review is open."

See also Dyestuffs and Chemicals, Inc. v. Flemming, supra, where it was held an evidentiary hearing was not required if the only objections asserted were legally insufficient.

 Of course, if a given request for an evidentiary hearing were to raise an issue of genuine fact within the regulations, and the Commissioner were to misapply the rules, that would be subject to correction by the Courts. Cf. N.L.R.B. v. Mar Salle, Inc., 425 F.2d 566, 573 (D. C.Cir.1970). But, that would be in the context of a definitive factual situation, and not in an abstract setting as presented here. In such a case, the reviewing court could determine whether the regulations were complied with, whether the Commission correctly applied the rules, and whether the Commissioner's reasons for his decision were sufficiently articulated. Cf. Community Service, Inc. v. United States, 418 F.2d 709 (C.A. 6, 1969).

The Court therefore holds that the hearing procedures of the May regulations are reasonable and valid procedures and that it was within the power of the Commissioner to require that a genuine and substantial issue of fact be raised as a condition for granting an evidentiary hearing—that is a drug firm be required to demonstrate that it had conducted and identified adequate and well-controlled investigations meeting the statutory definition of substantial evidence, in support of its claim for the effectiveness of its drugs.

The Court having found the May regulations to be valid, PMA's motion for a preliminary injunction will be denied. The matters herein decided being purely legal in nature and no genuine issue of material fact in dispute, the defendants' motion for summary judgment of dismissal will be granted.

The above shall constitute the findings of fact and conclusions of law as required by Rule 52(a), F.R.Civ.P.

An order will be entered in accordance with this opinion.